# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **YASMIN RUVALCABA,** | § | |
| *Plaintiff* | § | |
| | § | **CIVIL ACTION NO. _____** |
| **v.** | § | |
| | § | |
| **THE ANGLETON INDEPENDENT** | § | |
| **SCHOOL DISTRICT and JERRY** | § | **TRIAL BY JURY DEMANDED** |
| **CROWELL (Individually),** | § | |
| *Defendants.* | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### PRELIMINARY STATEMENT

1. This is an action brought pursuant to Title IX of the Education Amendments of 1972, 209 U.S.C. Sections 1681 to 1688, to obtain relief for Plaintiff Yasmin Ruvalcaba for a sexual assault that occurred at Angleton High School, a public school in the Angleton Independent School District in Angleton, Brazoria County, Texas.

2. By and through her attorney, Susan H. Soto, Plaintiff Yasmin Ruvalcaba (hereinafter "Yasmin") states that the Defendants' action and inaction violated her rights under the U.S. Constitution and Title IX of the Education Amendments of 1972.

## JURISDICTION

3. Jurisdiction of this Court is invoked pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 - 1688, and pursuant to 42 U.S.C. § 1983.

## VENUE

4. Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. § 1391(b)(2) in that this is a civil action wherein a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

5. **Plaintiff Yasmin Ruvalcaba** ("Yasmin") is an individual Hispanic female born in 1998, who was a minor at the time that this action was filed and who resides in Angleton, Texas. At all times relevant to this action, Yasmin was a student attending Angleton High School in the Angleton Independent School District in Angleton, Brazoria County, Texas, was a citizen of the United States, and was a person entitled to the protection of the Education Amendments of 1972 and the Civil Rights Restoration Act of 1987. Yasmin turned eighteen years of age in 2016, thus triggering the start of the two-year time period during which she may timely file a lawsuit against Defendants for the actions which form the basis for this lawsuit.

6. **Defendant Angleton Independent School District** ("AISD" or the "District") is duly organized and exists under the laws of the State of Texas and at all

times relevant to this action, was, and is, a recipient of funding within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. Defendant AISD may be served with process by serving the superintendent of schools, Phillip Edwards, at 1900 N. Downing Road, Angleton, Brazoria County, Texas 77515.

7. **Defendant Jerry Crowell** ("Crowell") is, and at all times material hereto was, an individual working as an employee and agent of Defendant AISD as the principal of Angleton High School. This action is brought against Crowell as an individual. Defendant Crowell may be served with process at 1 Campus Drive, Angleton, Brazoria County, Texas 77515.

7. Plaintiff is informed and believes, and on such grounds alleges, that at all relevant times, Defendant AISD's employees were authorized agents of AISD and were acting within the course, scope and authority of such agency.

8. Defendant AISD's failure to respond to Plaintiff's complaints or to stop the assault and harassment complained of herein despite its duty to do so and despite Plaintiff's requests and pleas, created an intimidating, hostile, offensive, and abusive school environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.

## CONDITIONS PRECEDENT

9. All conditions precedent have been performed or have occurred.

## FACTS

11. During the 2014-2015 school year, Yasmin was an incoming freshman at Angleton High School. She was on the Angleton High School's campus on October 7, 2014, in her sixth period band class. Yasmin was in one of the band hall's practice rooms practicing, as was customary for students to do.

12. During the band class on October 7, 2014, male Angleton High School student Joshua Farley ("Farley") entered the practice room and requested that Yasmin show him the proper way to hold a saxophone.   The band was preparing for a parade and UIL competition and Farley was set to perform in the competition as a substitute saxophone player. Farley did not know the proper instrument motions for the upcoming performances. He asked Yasmin to show him how to do the "T's and Z's," which are movements that marching band members make with their instruments while they perform. As Yasmin was demonstrating the technique to Farley, he took a music stand and propped it in front of the window in the door of the room, so that the view in to the room was obstructed.

13. Farley told Yasmin to put her saxophone down. She put it down on a chair and Farley told her to turn around so that her back would be towards him. She refused, saying "no," but he said it again, forcefully, which frightened her. Farley approached Yasmin, put his hands on her shoulders and turned her around himself.

Yasmin heard Farley's belt coming undone, then Farley directed her to turn around to face him. As she turned around, she saw that he had exposed himself.

14. Farley told Yasmin to get on her knees, she said "no," and he repeated his command. As a nonverbal threat, Farley looked at Yasmin's saxophone like he was going to hit her with it, which scared her even more. Yasmin got on her knees and Farley grabbed her head. Yasmin's hair was loose, so Farley grabbed her hair on the top of her head and forced her mouth to make contact with his member.

15. Farley put his member in Yasmin's mouth, and it felt to Yasmin like the assault took forever. Farley finally let go of Yasmin, adjusted and fastened his pants, turned around, and told her not to tell anyone what happened as he shook his finger at her.

16. Yasmin crumpled to the floor, cried, and wanted to go home. All Yasmin could think about was her mother and wanting her to comfort Yasmin. Yasmin calmed down so that classmates would be less likely to look at her and left the practice room. Yasmin went into the band room, put her belongings away, and waited by the door until the bell rang.

17. Her boyfriend at the time, Justin Moore, saw Yasmin in the hall during class change and saw that she had been crying. Yasmin told him, "Josh made me do something I didn't want to do." She repeated her story and felt very embarrassed.

The only way she knew to extricate herself from the uncomfortable situation was to tell Justin, "we are done" and then she went to her 7th period class. There, Coach Wiese, her government teacher, spoke to her. Yasmin told him that she broke up with her boyfriend, too embarrassed to tell the male teacher what really happened. Yasmin put her head down on her desk and cried throughout class. "Kylie," a classmate, asked if she was OK, as well. Yasmin told "Kylie" that she broke up with her boyfriend to avoid talking about the real reason she was upset.

18. Finally, the bell rang, and Yasmin hurried out and returned to the band hall to prepare for afterschool practice, not knowing what else to do besides continue her daily routine. Yasmin walked in the classroom and saw both Justin Moore and Farley, who kept staring at her. Understandably, she broke down again. Madison Daniels asked Yasmin if she was OK, and Yasmin said she broke up with her boyfriend.

19. Madison took Yasmin out into the hall and stated that she knew that something else was going on. She asked Yasmin for the truth and Yasmin told her, "Josh made me do something I didn't want to do." Yasmin was too embarrassed to share further details.

20. Madison's mother was Yasmin's first period hospitality class teacher that year. Madison and her boyfriend, Jared Pruneda, took Yasmin to Madison's

mother's classroom, where Yasmin was only able to tell the teacher "Josh made me ..." The teacher pressed Yasmin about what Farley did and Yasmin reported that he exposed himself to her in the band hall practice room. Hearing that, the teacher left the classroom to go get an administrator to assist.

21. Mr. Janczak, a MALE administrator, came and asked Yasmin what happened. Yasmin told him that Farley exposed himself to her. Mr. Janczak gave Yasmin a pen and paper and told her to write a statement. She started to write her statement and he went out of the room, then came back in, sitting right in front of her. Band director Nathan Carter came into the room with a sticky note and said, "Call me," handing the sticky note to Mr. Janczak.

22. Mr. Janczak came behind Yasmin while she was writing the words "he made me get on my knees and I did," saw the text, and stopped her from writing further. Mr. Janczak took the incomplete statement away and told Yasmin that she could finish it in the police department office located at the school. Yasmin never saw it again and never got to finish it.

23. Yasmin and Mr. Janczak went to the police office. Truancy officer Ms. Craig came and sat across from Yasmin and asked what happened. Yasmin told her that Farley exposed himself, but Ms. Craig responded by talking about her own car accident in the past. Ms. Craig asked Yasmin who to call and called Yasmin's

mother, who did not answer. Ms. Craig called Yasmin's father, John Jaso, who did answer, and she told him that someone needed to come pick Yasmin up from the police department office because she had been involved in an "altercation."

24. Mr. Jaso called Yasmin's mother, Laura Jaso, who was in Alvin, a full twenty minutes from the high school. He told Yasmin's mother to hurry because something had happened, but could only explain that school personnel said it was an altercation and that Yasmin was at the school police department office. Thinking it was a fight, Yasmin's mother told Mr. Jaso that she was on her way to the high school. Mrs. Jaso picked up her younger daughter and quickly got to the high school. Principal Jerry Crowell passed her on her way in, as he was on his way out. They met at the door, but he never said a word to Mrs. Jaso.

25. After asking for directions to the police office, Mrs. Jaso arrived and found Yasmin slouched over, despondent, with swollen red eyes. Mrs. Jaso could tell that Yasmin had been crying. Mrs. Jaso posed a general question of what happened to everyone in the room, but no one answered. Mrs. Jaso asked Yasmin, "How come you're not out there practicing with the band?" but all Yasmin could manage to say is, "I just can't" and she started crying again. Mrs. Jaso pressed Yasmin, asking again what might have happened, but Yasmin was unable to answer and continued to cry. Mrs. Jaso directed her question to Ms. Craig, asking "What

happened - why is she [Yasmin] here?" but Ms. Craig only offered to call an administrator to talk to Mrs. Jaso, which she did.

26. Ten or fifteen minutes later, administrator Christina Todd appeared in the police office, since Mr. Janczak left earlier in order to coach volleyball. Ms. Todd gave Mrs. Jaso the incomplete statement to read and just stood there while Mrs. Jaso read it. Mrs. Jaso, still not having the complete story, asked what happened next and pointed out to Ms. Todd that the statement was incomplete. Ms. Todd's only response was to say, "We are investigating." Mrs. Jaso asked Yasmin if her attacker was in any of her classes, to which Yasmin responded in the affirmative. Mrs. Jaso insisted that she did not want her daughter around Farley. Ms. Todd told Mrs. Jaso and Yasmin, "We'll look into it tomorrow. We need to determine if it's a crime." Ms. Todd informed Mrs. Jaso that "No one was told not to come to school," making Mrs. Jaso very concerned that Yasmin would have to face her attacker the next day.

27. Yasmin went with her mother to collect her backpack from the band hall, and Ms. Todd went with them. When they arrived at the band hall, Mrs. Jaso asked Yasmin where the attack happened and Yasmin pointed to the practice room.

28. As the family was walking out of the school, Mrs. Jaso was still asking questions, and Yasmin was trying her best to tell her mother what had happened, but she was crying and did not make any sense. The conversation escalated and Yasmin

ran back into the school after her mother, filled with emotion, said, "I NEED TO KNOW [what happened]!" Mrs. Jaso called her mother, Yasmin's grandmother, and asked her to come to the school because something bad had happened to Yasmin. In the meantime, Yasmin also called her maternal grandmother and asked her to come pick her up from the school. In the end, Mrs. Jaso returned to the police office and took Yasmin and her younger sister home, with Yasmin's grandparents on their way to the family's home, as well.

29. As Mrs. Jaso was driving her daughters to the house, the family was silent, with no talking or radio. Unable to keep the horrible secret inside any longer, Yasmin blurted out, "he put it in my mouth" and began gasping for air as her body was wracked with dry sobs. As the family pulled into the driveway, Yasmin let out a loud scream, "HE PUT IT IN MY MOUTH!" Mrs. Jaso took Yasmin in her arms and made the immediate decision to go to the Angleton Police Department.

30. Once the family got to the Angleton Police Department, Mrs. Jaso asked to speak to a police officer in order to make a report. She filled out an information sheet with the details she knew about the attack, an Angleton police officer read it, and contacted AISD police. Angleton ISD police officer Officer Williams responded to the municipal police department and acted surprised, asking questions of Yasmin like, "Why do you think that happened?" and "Where was the band director?"

Yasmin told him that the band teachers were in their office. When he asked about the reason for the attack, Mrs. Jaso stated that it was due to a lack of supervision. Officer Williams agreed, telling them "that's what it sounds like." Officer Williams had Yasmin write a statement. Angleton ISD Sergeant DeLeon arrived, as did Defendant Crowell.

31. After huddling with the two AISD Police Department officers, Crowell suggested that he wanted to speak with Yasmin alone, if Mrs. Jaso would permit it, as part of his investigation. He said, "I want to make this right. I'd like to talk to Yasmin alone. Is that OK with you?" Mrs. Jaso gave her permission and excused herself to go to the restroom. When she returned, Mrs. Jaso saw Sgt. DeLeon in the middle of the hallway, laughing. He told Mrs. Jaso that Yasmin was not going to march in band any longer. When pressed for a reason, he told Mrs. Jaso that he knew that from what Crowell said. At that point, Sgt. DeLeon was between Mrs. Jaso and the door to the room where Yasmin was with Defendant Crowell. Relying on her "sixth sense," Mrs. Jaso pushed past Sgt. DeLeon, opened the door (which did not have a window), and saw Yasmin starting to get up from the floor, within two feet of Crowell. It was obvious that Yasmin was at eye level with Crowell's groin. Mrs. Jaso saw Crowell sitting in a rolling chair, a short distance away from a desk, with Yasmin in front of him. Mrs. Jaso immediately told Yasmin to get up and asked

Crowell what he was doing. Crowell replied, "I didn't do anything, I just needed her to show me in order to investigate." Yasmin was crying again and her mother got her up from the floor.

32. Before leaving the Angleton Police Department, Mrs. Jaso told Defendant Crowell that everything her daughter had gone through thus far was "bullshit." Crowell said he would look into the situation the next day and asked Mrs. Jaso to give him until 2:00 PM. Before Yasmin and her mother were able to leave, Crowell requested that Yasmin sign the new statement before leaving. No one in Yasmin's family slept that night.

33.    Defendant Angleton ISD never provided Yasmin with preventive education programs that address sexual harassment or sexual violence, which would have helped Yasmin defend herself against Farley's unwanted advances and molestation. No Defendant suggested, offered or provided any strategies that could or would be implemented to protect and support Yasmin in the future as a victim of sexual assault.

34. When Mrs. Jaso arrived at the high school the next day, Defendant Crowell came out to greet her and asked for Yasmin, who was at home recovering from the attack. Crowell introduced Detective Chris Dubois and told Mrs. Jaso that

they wanted to talk to Yasmin. Mrs. Jaso, wanting to cooperate so that justice would be served, went back home and picked Yasmin up.

35. When Yasmin and her mother returned to the school, the men started asking Yasmin basic questions about the attack, despite the two statements from her which were already in her possession. Det. Dubois banged on the table, telling Yasmin things like, "I know you're lying and when I prove it, you're going to jail. I will file charges on you." Defendant Crowell just sat there, allowing the verbal attack on Yasmin to continue. Yasmin and her mother asked them to talk to Eric Guillen, the ineligible band student for whom Farley was to substitute, and "Kylie." Rather than call those students down to the office talk to them, the men continued using aggressive interrogation techniques to try and trip Yasmin up, saying what Yasmin was telling them "wasn't true." Mrs. Jaso was amazed that Defendant Crowell was comparing what Yasmin said during the meeting to what she told Crowell the day before, trying to find discrepancies in her story. Mrs. Jaso asked for the band director to join the meeting, which never happened, either. Det. Dubois took over the meeting and told Yasmin, "What you are reporting will affect him [Farley] for the rest of his life." He stressed, "You're lying. I will prove it and you will go to jail." Crowell also insisted that the attack did not happen. Yasmin pleaded

with the men, authority figures from her perspective, to explain why they did not believe her. She was brought to tears over the course of events once again.

36. Mrs. Jaso, not wanting the men to treat her daughter in such a barbaric way, reminded them that they were supposed to be investigating -- not berating her daughter, the victim. She ended the meeting, announced she was going home to take care of her daughter, and told the men that they needed to investigate the attack.

37. On October 8, 2014, Yasmin tried to commit suicide out of desperation – she was sexually assaulted at school and AISD staff either did not believe her or were deliberately indifferent about the incident. She took an overdose of pills and was treated at Angleton Danbury, now UTMB Galveston. When hospital staff asked Yasmin why she took too many pills, she sadly told them that she had been raped at her high school but that no one believed her.

38. Incredibly, Mrs. Jaso discovered that Det. Dubois is connected with Farley's biological and adoptive fathers on social media. On October 9, 2014, Mrs. Jaso took Yasmin and went to speak with AISD's Mark Comneck, knowing he was a resource for parents as the Title IX coordinator, and took him a print out of the Facebook page that shows that the detective knew Yasmin's attacker's parents, along with a list of potential witnesses. Mrs. Jaso asked for Mr. Comneck's help, but he said he knew nothing about the situation. Mrs. Jaso told Mr. Comneck what

happened, what Defendant Crowell did at the police station, what transpired at the meeting at the high school, and about the attempted suicide.   She told him that her daughter was not doing well and confided that she did not know how she could take Yasmin back to the high school (Yasmin did not go back to school after the incident). Mr. Comneck said he would call the school and asked that Mrs. Jaso wait for Crowell to call her. To date, Defendant Crowell has never called Mrs. Jaso. Yasmin verified for Mr. Comneck what Crowell made her do at the Angleton Police Department and role played it for him to a limited extent. Mr. Comneck had no comment, he just looked at Yasmin. He never advised Yasmin or her mother regarding their Title IX rights or the District's grievance procedure.

39. After the meeting with Mr. Comneck, Yasmin and her mother met Yasmin's grandmother for lunch at El Patio, a local restaurant in Angleton. Mrs. Jaso heard radio calls and saw AISD police chief James "Chip" Gail. His cell phone rang, Chief Gail answered, and Mrs. Jaso overheard him say things like, "She went over there? Are you serious?" "Oh, she's just mad," "Oh, Facebook doesn't prove anything," and "We're going to have to nip this in the bud," before Chief Gail disconnected the call. The AISD athletic director, Ryan Roark, was eating with the police chief, and the chief told him, "You're not going to guess what happened, the mom went over there."

40. Still, no one from AISD or Angleton High School took action to eliminate the hostile environment in which Yasmin now found herself, to prevent its recurrence, or to address its effects (or those of the sexual assault) on Yasmin after the attack. Defendants' failure to take reasonable remedial action violates Title IX of the Education Amendments of 1972, 209 U.S.C. § 1681, *et seq*. Angleton High School Assistant Principal Davila told the family that Yasmin would have to drop band instead of offering Yasmin a safety plan or an action plan.

40. With rumors about Yasmin running rampant at Angleton High School, Yasmin's parents discussed options for her schooling and considered Angleton Christian School ("ACS"). The family went there and spoke to assistant principal Terry Jones, who was very welcoming and even mentioned a discount for multiple children enrolled. Yasmin started attending there on a trial basis at staff member Gordon Smith's invitation, but shared her concerns about everyone knowing what happened to her at Angleton High School.

41. On Friday, October 10, 2014, tired of waiting for a call back from Crowell, Mrs. Jaso went to the District Attorney. She told the district attorney staff that no one in AISD did anything in response to the attack and told the staff about Chief Gail's telephone call that she overheard. Mrs. Jaso asked for help and asked that someone step in on her daughter's behalf. The district attorney staff said they

would ensure that the police department made an appointment for Yasmin at the Children's Assessment Center. Chief Gail made the appointment for the forensic interview for October 13, 2014.

42. Mrs. Jaso met with Chief Gail, who asked her about seeing him at El Patio. Mrs. Jaso confirmed that she saw and heard him, even drawing a diagram where everyone was sitting that day. Chief Gail told Mrs. Jaso, "I wasn't talking about you, I was talking about my employees spending so much time on Facebook." When asked, he told Mrs. Jaso that he would not remove Det. Dubois from the case, despite his horrible behavior towards Yasmin during the meeting at the high school.

43. On October 14, 2014, Angleton High School Registrar Carmen Dunkin initiated Yasmin's withdrawal from school and requested Yasmin's final grades from Yasmin's teachers.   Mrs. Jaso received a call from AISD on October 15, 2014 regarding Yasmin's absences. Mrs. Jaso informed the caller, Mary Griffith, that she was told to wait for Defendant Crowell's call, which still had not come. Yasmin's parents made the decision to withdraw Yasmin from Angleton High School and transferred her to ACS. Mrs. Jaso withdrew Yasmin from AISD on October 20, 2014. Within one hour after withdrawing Yasmin, Mr. Smith called from the Angleton Christian School and asked Mrs. Jaso to visit with him after work that day.

44. At the time, the Angleton Christian School was planning a student group trip to Boston; ACS extended the invitation to Yasmin to go on the trip. She went on the trip, but became increasingly upset and needed to call her mother for comfort and reassurance. In the middle of the trip, she had a panic attack and was threatened with early return to Houston if more issues arose.

45. In the meantime, on October 16, 2014, Yasmin had her first visit with a psychologist at UTMB in the Medical Center in Houston.

46. Mrs. Jaso learned on October 20, 2014 that Mr. Smith called Angleton High School as a result of several things Yasmin shared during the student trip to Boston. Defendant Crowell told him what happened to Yasmin while she was enrolled there.

47. In the days following Yasmin's change in schools, authorities from Angleton High School conferred with authorities at ACS regarding Yasmin. Suddenly, Yasmin was expelled from ACS in late October 2014. The reason provided for the expulsion was that she had been labeled as a "troublemaker" and did not belong at ACS. Mrs. Jaso found out later that Ms. Todd's husband was on the school board at ACS and is the Registered Agent for the Angleton Christian School Corporation.

48. Later on the day she was forced to leave ACS, Yasmin cut herself on the right wrist in another suicide attempt and she was taken to Ben Taub Hospital for emergency treatment. Yasmin was despondent, having no school to attend where she could feel safe, she felt her life was over. Mrs. Jaso had a conversation with a psychologist there, confessing that she did not know what to do if Yasmin hurt herself. It was determined that inpatient treatment would benefit Yasmin, so she spent a week at Cambridge Hospital. The young girl who once showed promise as a student and a musician came home with more medications to add to what she was already taking, including anti-psychotic medications that changed her. Yasmin gained weight, her eyes glazed over, and she now needed a psychiatrist, where she was seeing a psychologist before her release from Cambridge Hospital. She was diagnosed with Major Depressive Disorder, severe anxiety, Acute Stress Disorder, and Post Traumatic Stress Disorder as a result of the attack and subsequent treatment she suffered while a student in AISD.

49. On November 6, 2014, documentation was provided to the AISD Police Department and to Defendant Crowell with medical information regarding Yasmin's state and doctors' recommendations. There was no response from anyone.

50. Also in November 2014, Yasmin's throat was swabbed by medical personnel at UTMB and a diagnosis of chlamydia was confirmed. UTMB staff asked

Mrs. Jaso for the assault investigator's contact information, which she provided, and the medical staff provided a verbal update to AISD, commenting that the test results and diagnosis were consistent with Yasmin's report.

51. On December 11, 2014, Mrs. Jaso sent an email to the AISD Superintendent, Dr. Patricia Montgomery, requesting that the unprofessional behavior exhibited by AISD staff, demands made by AISD staff, and threats made by AISD stop immediately. Dr. Montgomery was informed that Yasmin's state had been deteriorating since October 7, 2014. Mrs. Jaso pointed out in her communication that AISD had medical documentation in its possession about Yasmin's mental state and condition. All of this information went ignored, even after Yasmin's mother's email to the superintendent of schools, and it was done willfully, maliciously, and deliberately.

52. Mrs. Jaso filed a report with the Office for Civil Rights. In June 2018, the OCR issued a letter stating that they had offered AISD "technical assistance" to comply with the Title IX Letter of Outcome dated June 13, 2018. Mrs. Jaso asked for assistance with an appeal on June 29, 2018, but no response has been received to date.

53. The District knew or should have known of the assault which took place and failed to take any appropriate action to protect Yasmin and to remedy the situation.

54. Yasmin, due to the assault and the ongoing harassment and intimidation after the assault, was denied the opportunity to take part in the normal activities of a high school student.

55. Defendants did not take the necessary disciplinary actions against Farley. Defendants never advised Yasmin or her parents regarding their Title IX rights or the school's grievance procedure. Defendants did not take interim steps to ensure Yasmin's safety and well-being while law enforcement fact-gathering was in progress. As a result of these failures, Yasmin's right to a non-hostile environment at school was denied.

56. As a direct and proximate result of Defendants' acts, Yasmin sustained injuries to her body and suffered, and will suffer, severe mental and emotional distress in the future, all to her damage in an amount to be proven in court.

57. Yasmin has suffered, and will continue to suffer, serious mental health problems, including but not limited to, depression, fear, and anxieties. As a result of these problems, Yasmin has undergone medical and psychological treatment and incurred medical expenses, all to her detriment.

58. As a proximate result of the acts of the Defendants, Yasmin has sustained and is continuing to sustain damages in the form of medical expense, additional cost to her education, and general damages in an amount that has not been ascertained and that will be proven at trial.

**COUNT I. Sex Discrimination Pursuant to Title IX of the Education Amendments of 1972, Ch. 39, 86 Stat. 235, 20 U.S.C. §§ 1681 *et seq*. and Pursuant to the Civil Rights Restoration Act of 1987, 102 Stat. 29, § 1687 (against Defendant AISD)**

59. Plaintiff realleges and incorporates by reference Paragraphs 1 through 58. Defendant AISD intentionally, willfully and without justification acted to deprive Yasmin on the grounds of her sex (hereinafter referred to as "gender") of her rights, privileges and immunities secured by the laws of the United States, particularly her right to be free from discrimination in education on the grounds of her gender as provided by Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

60. The Defendant District, despite knowledge and adequate opportunity to learn of the misconduct of its agents and employees, adopted, approved, and ratified these acts, omissions, and misconduct.

61. The gender-based harassment articulated *supra* was so severe, pervasive and objectively offensive that it deprived Yasmin of access to educational opportunities or benefits provided by the public school.

62. Defendant AISD created and/or subjected Yasmin to a hostile environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), because:

a) Plaintiff Yasmin Ruvalcaba is a member of a protected class;

b) She was subjected to sexual harassment in the form of a sexual assault by another student;

c) She was subjected to harassment based on her gender; and

d) She was subjected to a hostile environment created by AISD's improper procedures and failure to properly investigate and/or address the sexual assault and subsequent harassment.

63. Defendant AISD and its officials had actual knowledge of the sexual assault and the resulting harassment of Yasmin created by the school district's failure to investigate and discipline Yasmin's attacker in a timely manner and consistent with its own policy and Federal and state law.

64. Defendant AISD's failure to promptly and appropriately respond to the sexual harassment resulted in Plaintiff Yasmin, on the basis of her gender, being

excluded from participation in, being denied the benefits of, and being subjected to discrimination in the school district's educational program, in violation of Title IX.

65. Defendant AISD failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Yasmin.

66. Yasmin has suffered emotional distress and physical and psychological damage, and her character has suffered from the harassment as a direct and proximate result of Defendant AISD's deliberate indifference to her rights under Title IX.

WHEREFORE, Plaintiff prays for relief as hereafter set forth.

## COUNT II. Violation of 42 U.S.C. § 1983

### (against individual Defendant Crowell)

67. Plaintiff realleges and incorporates by reference as though fully set forth in Paragraphs 1 through 58.  In doing each and all of the acts alleged, individual Defendant Jerry Crowell was a state actor acting under color of state law.

68. Crowell subjected Yasmin to violations of her right to equal protection of law by failing to investigate Farley's misconduct, failing to appropriately discipline Farley, forcing her to reenact the attack, and manifesting deliberate indifference to the sexual assault at Angleton High School.

69. Crowell is included in this lawsuit through a Section 1983 claim that relates back to Yasmin's rights under Title IX. Long understood as a vehicle to enforce an existing Federal right, a Section 1983 action is brought against a party who acted under color of state law; that is, a person who carries "a badge of authority of a State" and represented it in some way. *Monroe v. Pape*, 365 U.S. 167, 172 (1971).

70. Defendant Crowell failed to preserve Yasmin's constitutional right to equal protection as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

71. Under the Equal Protection Clause of the Fourteenth Amendment, Yasmin had the right to equal access to an educational environment free from harassment and discrimination.

72. Crowell should have known that his response to sexual assault allegations must comply with Federal law, particularly as outlined in Title IX's published and widely promulgated regulations.

73. Crowell does not have immunity against this claim because he violated Yasmin's right to equal protection under the law.[1] Particular acts that demonstrate

---

[1] Nor does Crowell escape liability by possibly having delegated duties to his subordinates or police officers. He failed to follow the law and provide Yasmin with an educational environment free from sexual assault and discriminatory animus and with equal protection of law.

his personal and direct participation in constitutional and statutory deprivation of Yasmin's right to an educational environment free of sexual innuendo, intimidation, assault and discriminatory animus and the right to equal protection of law include: Crowell's failure to take remedial action and implement a plan that would protect Yasmin in the educational setting and his failure to ensure that his staff did so, Crowell's failure to investigate the assault that Yasmin endured and reported, and his failure to recommend attacker Farley's placement in a disciplinary alternative education program or juvenile justice alternative education program (as required by the Texas Education Code). The individual Defendant Crowell failed to advise Yasmin and her parents of the Title IX grievance process and the AISD grievance process under Board Policy FNG(LOCAL). The individual Defendant's conduct was unreasonable in light of the requirements under Federal law (Title IX), state law (Tex. Admin. Code), and local policy.

74. As the U.S. Supreme Court explained in *Harlow v. Fitzgerald*:

> "[W]e provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

75. All Defendants had a duty to provide and ensure an educational environment for Yasmin free of sexual innuendo, intimidation, assault and discriminatory animus and to enforce the regulations, rules, and laws necessary to protect Yasmin from the acts of sexual abuse, bias and discrimination.

76. All Defendants intentionally, willfully, and without justification did deprive Yasmin of her rights, privileges, and immunities secured her by the U.S. Constitution and the laws of the United States, including but not limited to, her rights to equal protection of law as provided by the Fourteenth Amendment of the U.S. Constitution, in violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff prays for relief as hereafter set forth.

## PRAYER

77. As a direct, proximate, and foreseeable result of Defendants' deliberate indifference to the sexual assault against Yasmin, Plaintiff Yasmin Ruvalcaba suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, emotional distress, and other nonpecuniary losses and intangible injuries.

WHEREFORE, Plaintiff prays for judgment against all Defendants and each of them as follows:

## DAMAGES

78. In *Davis v. Monroe County Board of Education,* the U.S. Supreme Court held that a plaintiff may prevail in Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is (a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and (b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. *Davis v. Monroe Co. Bd. of Educ.*, 526 U.S. 629, 1669-76 (1999).

79. As a direct and proximate result of Defendants' conduct, Plaintiff suffered and claims the following damages: for special damages for medical services and treatment and future educational expenses and tuition in an amount to be proven at trial;

80. For actual, compensatory, exemplary, and general damages in an amount to be proven at trial;

81. For costs of suit, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

82. For general damages in the sum according to proof; and

83. For such other and further relief as the Court may deem proper, just, equitable and applicable under statutory and common law, including but not limited to injunctive relief to prevent further and other conduct as alleged.

## JURY DEMAND

84. Plaintiff asserts her rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

Dated: August 28, 2018

Respectfully submitted,

By: /s/Susan H. Soto
Susan Herbst Soto
SBN: 24076707
FIN: 1812015
The Law Office of Susan H. Soto
6300 West Loop South, Ste. 405
Bellaire, Texas 77401
E-mail: SusanSotoJD@Gmail.com
Tel.: 832-831-9936
Fax: 877-231-7331

ATTORNEY FOR PLAINTIFF